# EXHIBIT A

# CHARGE OF DISCRIMINATION
Page 1 of 2

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

AGENCY
☒ FEPA
☐ EEOC

CHARGE NUMBER

## Arizona Attorney General's Office, Civil Rights Division and EEOC
State or Local Agency, if any

| Name (indicate Mr., Ms., Mrs.) Ms. Jenna Ausema | HOME TELEPHONE NO. (include Area Code) |
| --- | --- |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICE SHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME. (If more than one, list below.)

| NAME The GEO Group Inc. dba Central Arizona Correctional Facility | NUMBER OF EMPLOYEES/MEMBERS D | TELEPHONE NUMBER (include Area Code) 520-868-4809 |
| --- | --- | --- |
| STREET ADDRESS 1401 E. Diversion Dam Road | CITY, STATE AND ZIP CODE Florence, AZ 85132 | COUNTY Pinal |

| NAME The GEO Group, Inc. | | TELEPHONE NUMBER (include Area Code) 404-856-1000 |
| --- | --- | --- |
| STREET ADDRESS One Park Place, 621 NW 53rd Street, Suite 700 | CITY, STATE AND ZIP CODE Boca Raton, FL 33487 | COUNTY |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))
☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE
☒ RETALIATION ☐ DISABILITY ☐ GENETIC TEST RESULTS ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)    LATEST (ALL)
May 2012
☒ CONTINUING ACTION

THE PARTICULARS ARE (if additional space is needed, attach extra sheet(s)):

I.  **PERSONAL HARM:** A. I was subjected to different terms and conditions of employment and a sexually hostile and intimidating work environment. B. I was repeatedly denied promotional positions for which I applied and was otherwise qualified. C. I was repeatedly threatened with termination.

II. **RESPONDENTS REASON FOR ADVERSE ACTION:** A.-B. None given. C. Alleged failure to participate in an investigation; alleged failure to call in each day pending approval of FMLA leave.

III. **DISCRIMINATION STATEMENT:** I believe Respondent discriminated against me because of my sex, female, and because I opposed a practice made unlawful under the Arizona Civil Rights Act, as amended, and the Title VII of the Civil Rights Act of 1964, as amended. The particulars are:

A. On or around January 7, 2008, I began my employment as a payroll clerk at Respondent's Florence West facility. Shortly after beginning my employment I transferred to an inmate banker position at Respondent's Central Arizona Correctional Facility. In or around 2009 I was promoted to a CPO position and Respondent's CPS Rick Lewis became and remains my supervisor.

B. From the onset of my employment, and as recently as late September 2011, I and a class of similarly situated female coworkers have been subjected to ongoing, severe and pervasive sexual harassment and a sexually hostile work environment. Although I and my coworkers repeatedly complained about the conduct; including but not limited to reporting the conduct to my immediate supervisor, Rick Lewis, no effective remedial action was taken and the conduct persisted.

| I want this charge filed with both the EEOC and the state or local agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my complaint in accordance with their procedures. | Signature of Complainant and Date: X Jenna Ausema 5-31-12 |
| --- | --- |
| I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief. X Jenna Ausema 5-31-12 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) X [signature] 05/31/2012 |

| CHARGE OF DISCRIMINATION, PAGE 2 OF 2<br>This form is affected by the Privacy Act of 1974; See Privacy Statement before completing this form. | AGENCY<br>☒ FEPA<br>☐ EEOC | CHARGE NUMBER |
|---|---|---|

## Arizona Attorney General's Office, Civil Rights Division and EEOC

CASE NAME:  Ms. Jenna Ausema v. The Geo Group, Inc. dba Central Arizona Correctional Facility

C.  In or around August 2011 I participated in an internal investigation conducted by Johnny Johnson from Respondent's Corporate Office of Professional Responsibility. During the investigation Johnson asked me inappropriate questions of a personal nature and although I objected his conduct persisted.

D.  On or around March 23, 2012, after leaving work for a doctor's appointment, Johnson called my personal cell phone and propositioned me. When I told him I had a boyfriend he asked me if I had any friends I could set him up with as he wanted to "settle down" and reminded me that he was now Assistant Deputy Warden at Respondent's Florence West facility.

E.  On or around, September 20, 2011, Respondent became aware that I was named an aggrieved party and a class member by the State of Arizona and the United States Equal Employment Opportunity Commission in Case No. 2:10-cv-1995-SRB, The State of Arizona and the Equal Employment Opportunity Commission and Alice Hancock v. The GEO Group, Inc., alleging that I and a class of similarly situated female employees were subjected to different terms and conditions of employment, a sexually hostile and intimidating work environment, and retaliation.

F.  Beginning in or around 2011, and as recently as May 2012, Respondent has subjected me to increasing hostility and retaliation, including but not limited to over-scrutinizing my work, repeatedly telling me I was inappropriately dressed despite the fact that I was wearing clothing I had worn before and that was in compliance with Respondent's dress code and forcing me to clock out to go change clothing; repeatedly failing to promote me to positions for which I had applied and was otherwise qualified; and placing me on a pre-disciplinary 30 day watch period. I am aware that the coworkers, who are not class members in the above cited lawsuit and who wore similar attire were not forced to clock out and change clothing and were not put on a 30 day watch period.

G.  On or around April 19, 2012 Respondent subjected me to a coercive interview when its Director of Special Investigations, Alson Kanahele, called me to a meeting and told me that due to the aforementioned lawsuit to which I am an aggrieved party and a class member, Respondent was conducting a sexual harassment investigation.   Kanahele presented me with a confidentiality agreement and directed me to sign it. When I requested that, prior to answering any questions and/or signing the confidentiality agreement, I be permitted to speak to my attorney, Kanahele repeatedly threatened to place me on administrative leave without pay. Kanahele told me he would report my conduct to Warden Gay and told me I would be walked off the premises. Gay told me I would remain on administrative leave without pay until Kanahele could return to conduct the interview which he said could take up to two (2) months. When I continued to ask to speak to my attorney, Warden Gay told me that I was no longer a party to the lawsuit and my continued failure to cooperate with the investigation would "not be good for me." I understood Gay's comments and Kanahele's comments to be veiled threats to terminate my employment.

lxb/  2697700

# EXHIBIT B



**Thomas C. Horne**
ATTORNEY GENERAL

OFFICE OF THE ATTORNEY GENERAL
STATE OF ARIZONA

### CIVIL RIGHTS DIVISION
#### COMPLIANCE SECTION

Jenna Ausema,

          Charging Party,

v.

The Geo Group, Inc.,

          Respondent.

Complaint No. CRD T12-0415

## REASONABLE CAUSE
## DETERMINATION

The Arizona Civil Rights Division (the "Division") issues the following determination on the merits of this charge:

Charging party Jenna Ausema ("Ausema" or "Charging Party") was an employee of Respondent, the Geo Group, Inc. ("Geo" or "Respondent"), who worked at the Central Arizona Correctional Facility ("CACF") in Florence, Arizona from January 2008 to December 2012. On May 31, 2012, Ausema filed a timely administrative charge of discrimination against Geo (the "Charge"). In the Charge, Ausema alleged that throughout her employment by Geo, she and a class of aggrieved persons, her female coworkers, were subjected to ongoing sex-based discrimination and harassment severe and pervasive enough to change the terms and conditions of their employment and create a sexually hostile and intimidating work environment. She further alleged that Geo retaliated against her after it learned that the Division and the EEOC (collectively, the "Agencies") identified her as a class member and aggrieved party in a lawsuit that the Agencies filed against Geo, *Arizona ex rel. Goddard v. The Geo Group, Inc.*, Cause No. CV10-01995-PHX-SRB (D. Ariz.) (the "Lawsuit").

Specifically, the Charge alleged that Geo subjected Ausema and her female coworkers to ongoing, severe, and pervasive sexual harassment and a sexually hostile work environment. Ausema further alleged that since learning of her participation in the Lawsuit, Geo had retaliated against her by (1) forcing her to clock out and go home for alleged dress code violations, (2) placing her on a 30-day disciplinary watch period, and (3) threatening to place her on unpaid administrative leave for up to two months if she did not cooperate in an investigation related to the Lawsuit.

The Division's investigation revealed that there is reasonable cause to believe all female employees working at CACF were subjected to a hostile and intimidating work environment and that the sexual harassment crossed positions and classifications, including, but not limited to, Correctional Officers ("CO"), Correctional Programs Officers ("CPO"), Sergeants, Librarians, and Records Clerks. The investigation further revealed that sexually harassing conduct crossed shifts and harassers moved between shifts. Based on their employment at CACF within 180 or 300 days of the filing of the Charge, the Division indentified the following 32 women as additional aggrieved individuals:[1]

- Kathleen Conklin
- Angela Knapp
- Jessica Carbajal
- Christine Rainwater
- Lisa Mathey
- Nicole Boyd
- Susan Ashworth
- Mary Zapponi
- Belinda Vargas
- Yvonne Garcia
- Sonya Nichols
- Gloria Francisco
- Ava Espinoza
- Jennifer Ratliff
- Sherry Barkley
- Martha Cervantes
- Kawanas Cunningham
- Lucia Mendez
- Karen Barber
- Cindy Miller
- Sunni Sepulveda
- Teresa Willson
- Ana Zambrano
- Cassandra Osgood
- Shelia Justis
- Johanna Huber
- Kim Brunner
- Carolina Kakar
- Gilberta Curley
- Yolanda Bathan
- Susan Walker
- Belinda Vargas

Ausema testified, and numerous witnesses corroborated, that beginning in or around 2008, male coworkers and supervisors subjected her and her similarly situated coworkers to severe or pervasive acts of sexual harassment on a daily basis. Such conduct created a sexually hostile work environment for female employees at CACF. The Division obtained evidence that such sexually harassing conduct often occurred in front of inmates, coworkers, and supervisors. The investigation produced evidence, including but not limited to that set forth below, of (1) acts of sexual harassment directed at Charging Party, (2) acts of sexual harassment directed at the aggrieved women listed above, and (3) a sexually hostile work environment that pervaded CACF.

---

[1] The Division applies both the deadline for filing a charge under the Arizona Civil Rights Act ("ACRA") and Title VII because the Charge was dual filed with the Division and the EEOC. Under the Agencies' worksharing agreement, the Division investigated the Charge.

CVR00004

**A.  THE EVIDENCE PROVIDES REASONABLE CAUSE TO BELIEVE THAT CACF WAS A SEXUALLY HOSTILE WORK ENVIRONMENT FOR AUSEMA AND HER FEMALE COWORKERS.**

**1.  Acts Contributing to a Sexually Hostile Work Environment Directed at Ausema**

- Ausema testified that she believed Correctional Programs Supervisor Rick Lewis ("Lewis") was making sexual advances toward her when he repeatedly asked her if her divorce was final and if she was dating yet. Ausema felt uncomfortable when Lewis, her direct supervisor, asked her those questions.
- Ausema testified that Training Manager Matthew Rice ("Rice") and Compliance Manager Curtis Wille ("Wille") regularly asked to see her breasts.
- Ausema testified that Sgt. Gregory Souza ("Souza") made sexual remarks about her, including remarks about her underwear, in front of staff and inmates, and told staff and inmates that she was having sex with him.
- Ausema and CO Jessica Gonzales ("Gonzales") both testified that Maintenance Supervisor Wilburn Hassenzella ("Hassenzella") regularly made derogatory sexual remarks and gestures toward them and other women in the workplace.
- Gonzales testified that CO Victor Cooper ("Cooper") spread rumors about Ausema being "compromised" by an inmate porter.
- Ausema testified that during an Office of Professional Responsibility ("OPR") investigation into staff misconduct, Assistant Regional Director Johnny Johnson ("Johnson") asked her inappropriate questions, including but not limited to asking for her personal phone number. Ausema testified that she was uncomfortable with Johnson's conduct toward her during the interview and believed her was propositioning her for a date.
- Ausema testified that shortly after Johnson became Assistant Deputy Warden ("ADW") at Florence West, he called her personal phone and asked whether she was single and to hang out with him, because he was new to town. Ausema testified that when she told Johnson she was not single and did not live in town, Johnson reminded her he was now the deputy warden at Florence West and asked her if she had any friends that he could go out with.

**2.  Acts Contributing to a Sexually Hostile Work Environment Directed at Ausema's Female Coworkers**

- Gonzales testified that shortly after CACF opened, after arriving in the parking lot in the van in which she had carpooled, Cooper grabbed her legs, pulled her toward him and began "humping" her in front of another CO, then walked away laughing when she objected.
- Gonzales testified that Cooper regularly made unwelcome derogatory sexual comments to her about her sexual orientation including but not limited to telling her he didn't know she was strictly "lick-me and not dick-me," and asking graphic questions about sex.
- After she moved to graveyard shift in or around September 2011, CO Matthew Scott ("Scott") and CO Troy Livernois ("Livernois") subjected Gonzales to unwelcome sexual

4

CVR00005

harassment on a nightly basis, such as repeated propositions for sex and unwelcome and graphic questions regarding her sexual orientation.

- Scott also sent Gonzales a sexually explicit video of himself masturbating. Scott did not deny sending Gonzales the video, but testified that he "could not recall the incident."
- Gonzales stated that while she was supervising the laundry, CO Steven Wilden ("Wilden") told Gonzales to take off her bra and show him her "tits."
- Gonzales stated that she regularly witnessed Sgt. Furman demeaning women, including but not limited to dropping a log book and telling her to bend over and pick it up.
- Gonzales stated that Lt. Jesse Sanchez ("Sanchez") told her to sit on his lap so that he could pull her hair, and when she reported Sanchez's conduct to Lt. Hans Nielsen ("Nielsen"), he told her to ignore it.
- Gonzales testified that, even after she was terminated, Scott sent her a sexually explicit text message telling her he was "horny" and asking her to "hook up." Scott did not deny doing so.
- CO Patricia Norrbom ("Norrbom") and CO Jennifer Barrett ("Barrett") testified that throughout the course of their employment at CACF they regularly witnessed male COs looking at pornographic magazines while on shift.
- Barrett testified that she was subjected to obscene jokes and gestures during pre-shift briefings, including but not limited to male COs pointing to her crotch and saying that she had "camel toe" because her work pants were tight after a post-surgery weight gain.
- Barrett testified that while posted in the control room of one of the dorm pods, Cooper climbed up a ladder and called her over to him, where she found him with his pants down.
- CO Doug Long ("Long") testified that CO Bernice Hull told him that CO Najara was sexually harassing her and that she did not wish to work with him on transport. Long testified that he believed Hull had complained to Geo about Najara's conduct.
- In deposition, Warden John Gay ("Gay") acknowledged a complaint that CO Osbaldo Gonzalez exposed his penis in the control room and placed his penis on CO Andrea Mejia's arm.
- Norrbom stated that Osbaldo Gonzalez often "talked dirty" to her, including telling her that he wanted to "throw his wad" on her and stated that when she reported Gonzalez's conduct to Lt. Beauchamp, Beauchamp assigned her to two consecutive 90-day postings with Gonzalez so they could "work it out."
- Norrbom stated that while she was working in a dorm alone, CO Douglas Wilson ("Wilson") came in, asked her out, and then put his hand on her inner thigh and grabbed her crotch and told her he wanted to "pat her titties." Later that day, Wilson approached her in the yard and told her that he would like to "throw water on [her] boobs."
- CO Eric Campbell ("Campbell") testified that when he was a supervisor, Norrbom complained about Wilson, asserting that Wilson had propositioned her several times, but she refused his advances. Norrbom also asserted that Wilson physically blocked her from leaving the control room, forcing her to brush up against him in order to exit.
- Gonzales testified that in or around 2008, Wille, whose job duties included investigating sexual harassment allegations, sent pictures of his erect penis to CO Diana Bickerstaff ("Bickerstaff") and possibly to CPO Tiffany Appel ("Appel"), as well.
- CO Corey Hines testified that Wille liked to text "dirty" pictures to women, including CO Alicia Montaño.

5

CVR00006

- CO Teuta Dema ("Dema") testified that on one occasion, Wille sent a naked picture of himself to her cell phone.
- Gonzales testified that it "became known" that she reported Wille's conduct to Gay and testified that she was then treated with hostility, mostly by the male officers, who considered her a "rat."
- Barrett testified that Sgt. Jackson was very "touchy feely" with her and often hugged her.
- CO Valerie Banks ("Banks") stated that several female COs complained to her about Lewis's ongoing sexually harassing conduct toward them, including but not limited to CO Monika Caissie ("Caissie"), CO Amber Servedio ("Servedio") and CO Roberta Jones ("Jones"). Specifically they complained about Lewis repeatedly propositioning them. Banks stated that she was also aware that Lewis had propositioned or harassed Appel and Ausema.
- CO Sunshine Boyd ("Boyd") testified that Nielsen would make sexual jokes and remarks every day. She further testified that Nielsen would stare at her breasts and make comments about them and their size when she returned from maternity leave. She tried to ignore Nielsen's conduct, but it escalated. In or around 2009, Nielsen unhooked her bra in front of inmates, supervisors, and officers. Boyd testified that she reported the incident, but did not know if Nielsen was disciplined for it, but he retaliated against her for complaining.
- Campbell testified that Lt. Sanchez would give female applicants his phone number and tell them that he would help the applicant get a job with Geo. Campbell testified that Sanchez harassed cadet Doreen Sabogai Olague and threatened to make her life miserable and assign her to graveyard shift forever when the cadet ended a sexual relationship with him and spurned his continued advances.
- Barrett testified that during a certification training, CPO Charles Owens put his hand down the front of her pants, tried to molest her, and touched her neck.
- Barrett testified that Rice asked her if she would participate in a "threesome" with him and his wife, also a Geo employee.
- Campbell testified, and Gay's testimony corroborated, that Geo terminated Rice's employment after Gonzales disclosed to Gay via email that Rice and his wife were engaging in sexual activity with cadet Kayla Bedford, who was in Rice's training class and over whom Rice held decision making power regarding her continued employment.
- Gonzales testified that Hassenzella also subjected CO Sheronda Childs and CO Frances Glad to offensive sexual remarks, inviting them to look at his "cock and balls" in reference to a rooster tattoo on the inside of his thigh.
- Banks stated that Servedio complained to her that Hassenzella made sexual comments to her, including but not limited to telling her not to put one breast in the door, put them both in there.
- Banks stated that Caissie complained to her that Sgt. Julius Lockett ("Lockett") made unwelcome sexual comments to Caissie, including but not limited to asking her out to dinner and asking her if her breasts were real.
- Carole Garcia testified that Assistant Deputy Warden Rollins ("Rollins") had, on one occasion, cornered her by the vending machines and grabbed her buttocks.
- Banks stated that CO Sandra Nido ("Nido") told her that Rollins would ask her out to dinner, call her to his office and close the door, touched CO Freeman's buttocks and

breast, and also asked CO Juarez out on a date. Banks stated that Nido told her that she and other female COs were afraid when Rollins came around.

- Banks stated that Jones complained to her that ADW Billy Massingill ("Massingill") told Jones that now he was living in Coolidge and asked her to meet him for drinks.

- Banks stated that while posted in Dorm 2 Control, duty officer ADW Johnny Johnson made comments regarding his son's name – Major Johnson – telling Banks that he did not want his son to be bullied by having other kids call him "Major Penis," even though that was the intended meaning of his son's name. Banks stated that she was offended by his comments.

- Long testified that he heard that Lt. Langan ("Langan") had sent unwelcome pictures of his penis to Marina Garcia, and when Garcia objected, Geo transferred her to Phoenix West against her wishes.

- Lt. Michael Connor ("Connor") testified that Souza made comments in the workplace about liking breasts and made specific comments about CO Lorena Garcia's breasts.

- Banks stated that Servedio complained to her that Connor and Souza made graphic sexual remarks about Servedio to an inmate, including, but not limited to telling the inmate that they both had sex with Servedio and that her "pussy" had a bad smell and looked like it needed a weed cutter.

- In deposition, Gay acknowledged that Servedio alleged that Souza told her she needed a "good, hard fuck." He further acknowledged Servedio's allegations that Connor had intentionally placed his crotch near her shoulder area when she was seated in a chair and had made comments in Servedio's presence regarding another woman's inverted nipples and comments regarding another woman being a "squirter" and needing a "good bang."

- Banks stated that she, Jones, and CO Graciela Nicoletti ("Nicoletti") heard Connor and Souza make sexually graphic comments, including but not limited to how they were having sex with Garcia, Appel, and CO Elizabeth Lopez ("Lopez") and heard Connor make comments about how he liked how Lopez sucked his penis.

- Banks stated that Nido complained to her that Sgt. Jared Yoyokie ("Yoyokie") tried to kiss Nido at the snack machine.

- Barrett stated that Yoyokie pulled her into a closet, put his hands on her and started kissing her.

- Corey Hines testified that Yoyokie told him that he was having sex with Appel.

- CO Rhonda Morgan Chizmar testified that Sgt. Martin Richey ("Richey") would "touch people's hands in passing" and pat her and others on the back and that his conduct was unwelcome.

- Banks stated that several female COs complained to her about Richey's ongoing sexually harassing conduct toward them, including but not limited to CO Erica Juarez, Caissie, and Nido, who told Banks that Richey would hug Nido and tried to kiss Nido on the lips.

- Gay testified that Servedio and CO Lorena Ramirez submitted sexual harassment complaints to Respondent's anonymous hotline, in which they alleged that Connor and Souza subjected them to inappropriate sexual comments.

- Gonzales testified that she heard Souza on four or five occasions say "I fucked her in the backroom" referring to CO Crystal Pacheco.

7

CVR00008

### 3.   Additional Evidence of a Sexually Hostile Work Environment Throughout CACF

- Campbell testified that jokes and teasing based on sex and sexual orientation and other protected groups were common in the workplace. He further testified that the comments would likely shock those accustomed to an office or bank environment.
- Campbell testified that he received a complaint when he was Training Manager from a female cadet in which she alleged that Scott was spreading rumors that he had had a sexual relationship with her.
- Connor testified that "off color" remarks were regularly made in the workplace.
- Hassenzella acknowledged that he and others regularly used the words "fuck" and "bitch" in the workplace.
- Boyd testified that she knows that a lot of female correctional officers feel that they have been subjected to sexual harassment.
- Ausema testified that the sexual harassment pervaded the workplace, and that sexually offensive and degrading remarks were made to and about women in front of inmates on a daily basis. Ausema further testified that because her safety depended upon respect from inmates, the sexual harassment that inmates observed threatened her safety, as well as the safety of the facility as a whole.
- Catherine York stated that throughout her employment she witnessed male COs and supervisors make comments that demeaned the ability of women to perform correctional officer duties, undermining the authority of female COs in front of inmates.
- Gonzales testified that sexual harassment on day shift was rampant and she witnessed the sexual harassment of female officers on day shift throughout her employment.
- Gonzales testified that on day shift, officers would talk over the radio about female officers' "big ass," "fine ass," and "titties," and that the radio traffic could be heard by anyone monitoring radio communications, including other officers, managers, and inmates.
- Bourdon stated that she was aware of a female CO, who was working in the main control room, when a male CO came in behind her, dropped his pants and "danced" on a pole in the room exposing his erect penis.
- Norrbom stated that CO Robert Shifflett often used derogatory words to describe female officers and women in general, including the words "pussies," "cunts," "whores," and "stretched out pussies."
- Norrbom stated that Wilson ranted that he hated working with "fucking females" as they "always get you compromised."
- Crystal Burrell testified that on multiple occasions she heard Wilson state that women do not belong in corrections because they are easily compromised and "women spread their legs for inmates."
- Gonzales stated that Wilden made statements about women being whores and that they should be treated as such.
- Ausema testified that Wilden also subjected her to sexually offensive remarks.
- Gonzales testified that female correctional officers were often chastised by supervisors in front of other officers and inmates while male officers were addressed in private regarding performance concerns.

CVR00009

- Barrett stated that Sgt. Christopher Porter invaded women's space to intimidate and belittle them in front of inmates and stated that Porter leered at women's breasts.
- Gonzales testified that she often felt safer with the inmates than with her fellow male officers.
- Campbell testified that while he was working as the Training Manager at Florence West he would regularly hear stories about the inappropriate comments Nielsen would make to female staff, including his direct report subordinate employees.
- Campbell testified that Nielsen had a reputation for being pretty bad and for being out of line with female staff.
- Campbell testified that he believed that Sgt. Scheffler sexually harassed a subordinate female CO.
- Campbell testified that Rice had a reputation in the workplace for being inappropriate toward women and for making sexual jokes and was regularly "out of line."
- Amy De La Cerda stated that Lt. Bowen repeatedly referred to yard assignment as "a man's job," restricted female COs to the dorms, told her she should be at home taking care of children, and treated female COs in a hostile and intimidating manner.
- Gay testified that CO Bonnie Lagunas filed a complaint against Richey regarding an incident in the main control room in which Richey placed his hand on her shoulder. Gay could not recall what actions were taken against Richey regarding the incident. Gay testified that the incident was not out of character for Richey.
- Boyd testified that Richey had a reputation for harassing female COs.
- Campbell testified that Richey had a reputation for being inappropriate toward female staff and for being a womanizer. He further testified that Richey "tended to hug female staff," and that he found Richey's conduct toward women in the workplace to be inappropriate and to set the wrong tone in a prison.
- Gonzales and Carole Garcia testified that Rollins had a reputation around the facility for being a womanizer. They further testified that Rollins treated female employees with hostility that he did not show toward male employees.
- Ausema testified that there were several supervisors whose reputations preceded them and who were well known for sexually harassing conduct and for "discussing female staff," including but not limited to Lt. Luis Beltran ("Beltran") and Lt. Luis Duran.
- Campbell testified that Beltran also had a reputation of being a womanizer and was rumored to have given an employee of the month award to a female CO he was purported to be sleeping with.
- Long stated that Jones and CO Ronita Parker asked the union to assist them in ensuring that Geo did not rehire Beltran – who had voluntarily resigned his employment with Geo, then reapplied – because he had sexually harassed them.
- Boyd testified that she was aware that both Souza and Connor talked in a derogatory manner toward women and testified that that was their "regular personality," their modus operandi, and that they both had a reputation for acting in that manner toward women.
- Lockett testified that although he never witnessed Souza's or Connor's conduct personally, he did hear others complaining about their conduct, specifically that Souza and Connor were unprofessional in the way that they talked to women.

9

CVR00010

- Campbell testified that, around the facility, Connor and Souza had a reputation for being sexual harassers, regularly making off color jokes, and that no topic was off limits to them.
- Scott testified that he had heard about Souza's sexual exploits at CACF since he was in the Correctional Officer Training Academy, and that he had heard talk that Souza claimed that he had sex with female officers.
- Scott testified that Sgt. Jeffrey Perry ("Perry") got a little too friendly with women under his supervision, and both Scott and Campbell testified that Perry was know for talking about his penis, referring to it as "Little Jeffrey."
- Scott testified that he had not personally witnessed Perry harassing women, but female correctional officers complained to him about Perry's conduct.
- Campbell testified that Perry was "pretty bad" and was known, like Richey, to proposition just about every woman in the facility.
- Boyd testified that CO Robert Tremont ("Tremont") used sexually derogatory language while at CACF. Tremont had been a sergeant at Florence West, and Geo transferred him to CACF after discipline related to his demeaning treatment of female correctional officer(s).

## B.   THE EVIDENCE DEMONSTRATES GEO'S INEFFECTIVE ENFORCEMENT OF PROTECTIVE POLICIES.

Geo has an anti-harassment policy, a method of disseminating the policy, and conducted annual sexual harassment training.   However, there is evidence that Geo implemented its anti-harassment policy inadequately and applied the policy unequally, including the following.

### 1.   Geo downplayed harassment complaints and did not adequately discipline harassers.

- Gonzales testified that her complaints and the complaints of her female coworkers regarding sexual harassment and humiliation were dismissed as nothing more than "joking around," and she testified that the sexually harassing conduct to which she and her coworkers were subjected on a daily basis persisted.
- Gonzales testified that she complained to her immediate supervisor Lockett about Scott's conduct and about the sexual harassment from other COs she experienced on graveyard shift, but he told her that he did not want to hear about it, "not another word," and took no effective remedial action to stop it.
- Norrbom stated that when she complained about a harasser, her supervisor put her on another 90-day post with the same officer, so that they could work it out.
- Gonzales testified, and Gay acknowledged, that Gonzales reported Wille's conduct to Sgt. Porter, who then reported the conduct to Gay — including providing Gay the pictures that Wille had sent to female subordinates.
- In his testimony, Gay trivialized Wille's conduct of texting a photo of his erect penis to a female CO by stating that it was "on his personal cell" and was not sent while he was at work.   However, at the time Wille sent the photo to at least one female CO, he held the position of Compliance Manager and was assigned to investigate allegations of staff misconduct.

CVR00011

- Gay testified that he "engaged" Wille regarding the incident because a person at his level or position should not engage in conduct that could bring embarrassment to the facility, but did not recall the level of discipline imposed. Geo did not terminate Wille's employment, place him on unpaid leave, or reassign his position as Compliance Manager.
- Gay testified that he vaguely recalled an incident in which Nielsen was alleged to have grabbed or touched Boyd's bra strap and testified that he "heard about it" sometime after the incident had occurred, but could not recall what, if anything, he did to address the matter.
- Campbell testified that following Norrbom's complaint of physical and verbal harassment by Wilson, he was only "administratively reassigned to Florence West" as a result of the incident.
- Ausema testified that when she reported some of the incidents of sexual harassment she experienced to Lewis, her supervisor, he would tell her that she worked in a prison, she should have tough skin and just get over it.
- Campbell testified that it was hard to believe management was not aware of Connor's and Souza's conduct before employees made complaints against them, because everyone at the facility was aware of their sexually harassing conduct.
- While Geo ultimately terminated Connor and Souza, their conducted went unchecked for years.
- Campbell testified that he believed that Geo terminated Perry after a sexual harassment complaint. However, he further testified that Geo promoted Perry to sergeant, even though his widely known harassing conduct began when he was a CO.
- Despite his reputation for inappropriate conduct toward women in the workplace, Geo recently promoted Richey to lieutenant and moved him to Florence West.
- Gay testified that other than Souza, Connor, and Training Manager Matthew Rice, he was not aware of any other employees who were terminated for sexual harassment.

2. **CACF management did not consistently follow Geo policy regarding reporting and investigating sexual harassment.**

- Documents produced by Geo revealed that Geo has a policy that all allegations or incidents of sexual harassment by a co-worker or supervisor must be "immediately" reported to its Office of Professional Responsibility ("OPR") and will not be investigated without prior OPR approval. All completed investigations of sexual harassment that are not done by a corporate investigator must be provided to OPR for review.
- Testimony supported that, for many years, Geo did not assign regional or corporate level investigators to investigate the numerous complaints of sexual harassment at CACF.
- Gay's testimony revealed that he does not act in accordance with Geo's policy because he did not report all allegations of sexual harassment to OPR and, at times, he or his staff would look into allegations without consulting OPR. For example, Gay stated that his staff investigated several allegations by Sofia Hines ("Hines") of sexual harassment at CACF. He also conducted investigations and did not provide the results to OPR for its review. For example, Gay did not report Sofia Hines's complaint that Sgt. Furman said in Spanish to "suck [his] dick" in front of her and CO Bird, and he did not elevate her complaint that Hillsden slapped her butt in the chow hall in front of inmates and officers.

11

Nor did Geo open an OPR case when the hospital complained that Hillsden had harassed a female nurse.

- Gay testified that prior allegations of sexual harassment against an employee would only be considered when recommending discipline, but would not be considered when investigating new allegations or in the decision whether or not to sustain allegations of sexual harassment against an employee.
- Gay testified that investigators do not have access to personnel files during the investigation.
- At times, supervisors did not report alleged harassment incidents to Geo's management or Human Resources, but addressed them unilaterally, if at all.
- Gay testified that, in spite of a Geo policy that requires that all sexual harassment complaints be forwarded to OPR, he uses his discretion about whether to open OPR cases for some allegations. He may not open an OPR case for a sexual harassment complaint where the alleged harassment was solely verbal or where, after initial fact finding, he or his staff determined the incident did not occur.
- Gay testified that depending on the circumstances surrounding a complaint of sexual harassment, he decides whether or not the accused will be separated from the accuser pending investigation.
- Gay testified that he did not believe that Furman received any formal discipline, despite having admitted to the conduct and despite being Hines's and Bird's immediate supervisor. Gay testified that Rollins merely called Furman, Bird, and Hines into the office and spoke to them individually about the inappropriateness of the behavior such that the employees involved had a "clear understanding and that was the end of it."
- Gay testified that he believed that the way in which Rollins handled Hines's complaint was sufficient to ensure that it would not occur again.
- Hines testified that Furman's offensive conduct toward her persisted after she reported the inappropriate comments and after she submitted a second complaint regarding Furman's conduct.
- Hines testified that after submitting a second complaint regarding Furman's continued inappropriate sexual comments toward her, Rollins placed her on administrative leave without pay.[2]
- Gay testified that Furman received no discipline in relation to Hines's second complaint regarding Furman's continued inappropriate sexual comments.
- Dema testified that after she reported to Geo that Wille had sent her naked pictures of himself and offered to help her in an investigation if she gave him a blow job, she was placed on administrative leave without pay and terminated. Geo did not take any disciplinary actions against Wille.

Based on the investigation, including the foregoing evidence, the Division concludes that there is reasonable cause to believe Ausema and her female coworkers were sexually harassed and subjected to a sexually hostile work environment. Moreover, the investigation revealed evidence giving the Division reasonable cause to believe that Geo was aware of and allowed sexually harassing conduct to persist and pervade the work environment in violation of its protective

---

[2] Hines's discipline was later reduced to five days' suspension without pay.

CVR00013

policies, rendering those policies ineffective, thereby perpetuating a sexually hostile and intimidating work environment for its female employees.

## RETALIATION

### A.   PROTECTED ACTIVITY

Ausema responded to an inquiry from the Agencies regarding the Lawsuit and affirmatively indicated her desire to participate as a class member. On or about September 1, 2011, the agencies identified Ausema as a class member in the Lawsuit. On April 17, 2012, the court entered an order dismissing claims made on behalf of Ausema and several other aggrieved class members.

### B.   ADVERSE EMPLOYMENT ACTIONS

**1.   Ausema lost pay when Geo required her to clock out and go home to change for alleged dress code violations.**

- Ausema testified that, after being named a class member in the Lawsuit, Geo sent her home on at least two occasions for alleged dress code violations. On one occasion Lewis decided to send her home and on another occasion Lewis told her that Gay had directed her to go home and change, even though she had not seen Gay that day. Gay testified that he did not direct Lewis to send Ausema home.
- Ausema testified that Lewis told her to clock out, go home, and change because her knee-length capri pants violated the dress code requiring capri pants to be mid-calf length. Ausema testified that she had worn the same pants without incident before joining as a class member in the Lawsuit.
- Ausema testified that upon returning to work she saw a coworker, who had not been named a class member in the Lawsuit, wearing the same pants, but that coworker was not required to clock out, go home, and change.

**2.   Geo placed Ausema on a 30-day watch period for tardiness.**

- Ausema testified that her attendance habits had not changed since joining as a class member in the Lawsuit.
- In its position statement, Geo noted that Ausema's 2011 performance appraisal noted that she had been a few minutes late on several occasions. However, Geo took no further action regarding Ausema's tardiness until after she joined the lawsuit.
- In February 2012, Massingill told Ausema that he was going to monitor her punctuality until March 14, 2012. Ausema's punctuality improved during the 30-day period.
- Ausema testified that initially Massingill targeted only her regarding tardiness and had not intended to address tardiness concerns with Appel or with Substance Abuse Counselor Foggenbush, both of whom were regularly tardy, but were not class members in the Lawsuit. Ausema testified that only after she asked Massingill why Appel and Foggenbush were not also being monitored for tardiness did Massingill place Appel on a 30-day watch.

13

CVR00014

- Ausema testified that despite the fact that Appel continued to be tardy throughout her 30-day watch period, Geo took no further disciplinary action against Appel.

### 3.  Geo subjected Ausema to a coercive interview with its corporate OPR representatives and repeatedly threatened Ausema with termination.

- Ausema testified that on or around April 19, 2012, without prior notice, she was told to report to human resources for a meeting with Geo's Corporate OPR Director of Special Investigations, Alson Kanahele ("Kanahele"). Ausema testified that she was required to sign a confidentiality agreement, after which Kanahele told her that based upon the Lawsuit, he had questions about things that had been going on at the facility.
- Ausema testified that at the time of the interview with Kanahele, she did not know that she was no longer a class member, and testified that she repeatedly told Kanahele that she did not feel comfortable discussing the Lawsuit with him without first speaking to an attorney for the ACRD or EEOC.
- Ausema testified that Kanahele became hostile and aggressive toward her and told her that if she did not answer his questions, she would be deemed to be refusing to participate in an investigation in violation of Respondent's policies, which could result in the termination of her employment. Ausema testified that Kanahele threatened her with termination approximately five times over the course of two hours.
- Gay testified that Kanahele wanted him to contact his supervisor and get authorization to place Ausema on leave without pay until such time as Kanahele could finish the investigation. Gay testified that before acting on Kanahele's request, he wanted Ausema to understand that Kanahele was requesting that she be placed on leave without pay for failure to participate in the investigation.
- Ausema testified that Gay informed her that she was no longer a class member in the Lawsuit.
- Ausema and Gay testified that Gay stated that she needed to think about what was good for her, as a single mother of two, because if she continued to refuse to answer Kanahele's questions it would only take one phone call to have Ausema walked out of the facility and placed on administrative leave without pay until Kanahele could return to complete the interview.
- Ausema testified that Gay repeated his threat to place her on administrative leave without pay, which she believed would have led to her termination.
- Ausema testified that after being subjected to the coercive interview, in or around May 2012, she felt compelled to go out on FMLA leave due to the stress and anxiety it caused her.
- Kanahele testified that he was given a list of former class members who still worked for Geo. Because class member Roxanne Valenzuela remained in the Lawsuit after the court dismissed Ausema and others, Kanahele was given specific instructions not to interview Valenzuela. Kanahele testified that he only interviewed class members on the list provided to him.
- Geo has not interviewed any employees who were not named class members regarding the facts forming the basis of the Lawsuit.

14

CVR00015

The investigation revealed that similarly situated Geo employees who did not engage in protected activity were treated more favorably than Ausema.   Moreover, Geo's scrutiny of Ausema's compliance with Geo policy and its threats to place her on unpaid leave for seeking to speak to an attorney for the Agencies before being interviewed about the Lawsuit are the type of conduct that could chill an employee's participation in protected activity. Geo took these actions only after it had knowledge of Ausema's participation in the Lawsuit.   As such, there is reasonable cause to believe that Geo retaliated against Ausema. Furthermore, because Geo did not send home another employee who dressed in the same pants as Ausema, did not discipline Appel after she continued to be tardy during her 30-day watch period, and interviewed only the former class members for its investigation, its proffered justifications for its adverse actions appear to be pretextual.

Based upon its investigation, the Division has determined that there is reasonable cause to believe that Geo discriminated against Ausema and a class of aggrieved female CACF employees in violation of A.R.S. § 41-1463(B)(1). In addition, the Division has determined that there is reasonable cause to believe that Geo retaliated against Ausema in violation of A.R.S. § 41-1464.

Having determined that there is reasonable cause to believe that unlawful employment practices have occurred, the Division now invites the parties to join with it in an effort to resolve this matter through conciliation.   The confidentiality provisions of Arizona law apply to all information shared and received during conciliation. The parties may indicate their willingness to engage in conciliation by contacting the Division at (602) 542-4909 within five (5) working days.

For the Arizona Civil Rights Division:

_____5/23/13_____
Date

By: _____ FOR
Ernest Granillo
Compliance Manager

3224816 v.2

15

CVR00016

# EXHIBIT C



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Phoenix District Office

3300 N. Central Avenue, Suite 690
Phoenix, AZ 85012-2504
(866) 866-8075
TTY (602) 640-5072
FAX (602) 640-5071

Charge No. 35A-2012-00336

Ms. Jenna Ausema                                    **Charging Party**

The Geo Group                                       **Respondent**
1401 E. Diversion Dam Road
Florence, AZ 85132

# D E T E R M I N A T I O N

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, et seq. Timeliness and all other requirements for coverage have been met.

Charging Party alleged that because of her sex, female, she was subjected to ongoing, severe, and pervasive sexual harassment and a sexually hostile environment. Charging Party further alleged that since learning of her participation in the previous lawsuit, Respondent retaliated against her by (1) forcing her to clock out and go home for alleged dress code violations, (2) placing her on a 30-day disciplinary watch period, and (3) threatening to place her on unpaid administrative leave for up to two months if she did not cooperate in an investigation related to the previous lawsuit.

Having examined the Arizona Civil Rights Division's reasonable cause finding, I hereby adopt it as EEOC's finding of reasonable cause. I find that Respondent discriminated against Charging Party, Jenna Ausema, by sexually harassing her because of her sex, female. I also find that Respondent retaliated against Charging Party, Jenna Ausema, because she opposed the sex discrimination and/or because she participated in the EEOC's previous lawsuit against Respondent.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. The confidentiality provisions of Title VII of the Civil Rights Act and Commission

Regulations apply to information obtained during conciliation.

If the Respondent wishes to accept this invitation to participate in conciliation efforts, it may do so at this time by proposing terms for a conciliation agreement. Those terms should be provided to the Commission representative, Tara Crubaugh, at (602) 640-5093 within 14 days of the date of this determination. The remedies for violations of the statutes we enforce are designed to make the identified victims whole, and to provide corrective and preventative relief. These remedies may include, as appropriate, an agreement by the Respondent not to engage in unlawful employment practices, placement of the Charging Party in a position she would have held but for discriminatory actions, back pay, restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation(s) and the resolution of the charge.

On Behalf of the Commission:

MAY 2-8-2014
_____
Date

Rayford O. Irvin
District Director

# EXHIBIT D

EEOC Form 161-A (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE
## (CONCILIATION FAILURE)

To:   Jenna Ausema

From:   **Phoenix District Office**
        3300 North Central Ave
        Suite 690
        Phoenix, AZ 85012

☐   *On behalf of person(s) aggrieved whose identity is*
    *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 35A-2012-00336 | Melinda L. Caraballo,<br>**Supervisory Investigator** | **(602) 640-5019** |

### TO THE PERSON AGGRIEVED:

This notice concludes the EEOC's processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Rayford O. Irvin*

Enclosures(s)

**Rayford O. Irvin,**
**District Director**

MAY 2 9 2014

*(Date Mailed)*

cc:   THE GEO GROUP DBA CENTRAL ARIZONA
      CORRECTIONAL FACILITY

      Kristy Peters
      Littler Mendelson, PC
      2425 East Camelback Road – Suite 900
      Phoenix, AZ 85016

Stephen G Montoya
Montoya Jimenez & Pastor
3200 North Central Avenue – Suite 2550
Phoenix, AZ 85012-2490